**BRISTOL–MYERS SQUIBB COMPANY, Appellant,**

v.

**Donna E. SHALALA, Secretary of Health and Human Services, and David A. Kessler, M.D., Appellees.**

**No. 95–5399.**

United States Court of Appeals,
District of Columbia Circuit.

Argued March 22, 1996.

Decided Aug. 16, 1996.

Michael B. Waitzkin, Washington, DC, argued the cause for appellant. Terry S. Coleman, John D. Kiser and Matthew D. Peterson were on the briefs.

Howard S. Scher, United States Department of Justice, Washington, DC, argued the cause for appellee, with whom Douglas N. Letter, Litigation Counsel, and Eric H. Holder, Jr., United States Attorney, were on the brief.

Before: GINSBURG, RANDOLPH and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

Bristol–Meyers Squibb brought an action in the district court to challenge the regulations of the Food and Drug Administration that govern approval of a new generic drug based upon research paid for by the manufacturer of the "innovator" or "pioneer" drug with which the generic product is therapeutically interchangeable. The district court dis-

missed the company's complaint on the ground that the allegations therein did not satisfy the constitutional requirements for standing to sue in federal court, as explicated by the Supreme Court in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The district court subsequently denied the appellant's motion for leave to file an amended complaint intended to cure the standing problem. That was an error; we hold that the supplemental allegations in the amended complaint suffice to establish the appellant's standing.

BMS urges us, in the interest of economy, also to determine the merit of its claim as a matter of law, and the Secretary does not object. For the reasons stated below, we read the Food, Drug, and Cosmetic Act, as amended, in the same way the Secretary does. Accordingly, we remand this case to the district court with instructions to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) and to enter judgment for the appellees.

### I. Background

The Food, Drug, and Cosmetic Act, as amended by the Drug Price Competition and Patent Term Restoration Act of 1984, provides that "[n]o person shall introduce or deliver for introduction into interstate commerce any new drug, unless [FDA] approval ... is effective with respect to such drug." 21 U.S.C. § 355(a). In order to obtain such approval, a drug manufacturer must ordinarily file a new drug application (NDA), pursuant to 21 U.S.C. § 355(b); if the new drug is a generic version of a "listed" (*i.e.*, previously approved) drug, however, then the manufacturer may file an abbreviated new drug application (ANDA), pursuant to 21 U.S.C. § 355(j).

The principal advantage of securing approval under § 355(j) is that the applicant may rely upon research paid for by the manufacturer of the listed drug. An NDA for a pioneer drug submitted under § 355(b) must include test data demonstrating that the drug is safe and effective for one or more indicated uses. Section 355(j) allows the manufacturer of a generic drug to prove that its generic product is safe and effective by demonstrating its similarity to a pioneer drug already found by the FDA to be safe and effective. (The generic drug must contain the same active ingredients as the pioneer drug, but need not contain the same inactive ingredients. *United States v. Generix Drug Corp.*, 460 U.S. 453, 454–55, 103 S.Ct. 1298, 1299–300, 75 L.Ed.2d 198 (1983)).

The purpose of § 355(j) is to promote competition, but not without limitation. The Act offers the manufacturer of a pioneer drug protection from the competition of generic drugs for a period of five years from the date upon which the FDA approves an NDA submitted under § 355(b). During that period no applicant (with an exception not relevant here) may submit an ANDA "which refers to the drug for which the [§ 355(b) ] application was submitted." § 355(j)(4)(D)(ii). In addition, and of more immediate concern:

> If a supplement to an application approved under [§ 355(b) ] is approved ... and the supplement contains reports of new clinical investigations (other than bioavailability studies) essential to the approval of the supplement and conducted or sponsored by the person submitting the supplement, the Secretary may not make the approval of an application submitted under [§ 355(j) ] for a change approved in the supplement effective before the expiration of three years from the date of the approval of the supplement under [§ 355(b) ]....

§ 355(j)(4)(D)(iv).

The precise scope of the protection thus conferred upon the manufacturer of a pioneer drug is at issue in this dispute, but our resolution of that issue depends upon whether the Secretary has correctly construed another provision in the same section of the Act. That provision, § 355(j)(2)(A)(v), describes one of the ways in which a new generic drug product must resemble a pioneer drug if the manufacturer of the generic is to benefit from research undertaken in order to secure FDA approval of the pioneer: The § 355(j) applicant must

> show that the labeling proposed for the new drug is the same as the labeling approved for the listed drug ... except for changes required because of differences approved under a petition filed under

[§ 355(j)(2)(C)] or because the new drug and the listed drug are produced or distributed by different manufacturers.

The FDA regulation implementing this provision, 21 C.F.R. § 314.94(a)(8)(iv), states:

Labeling (including the container label and package insert) proposed for the new drug product must be the same as the labeling approved for the reference listed drug, except for .... omission of an indication or other aspect of labeling ... accorded exclusivity under [§ 355(j)(4)(D)].

See also 21 C.F.R. § 314.127(a)(7) (grounds upon which FDA will deny ANDA).

BMS takes issue with the exception, arguing that it "virtually eliminate[s]" any benefit that the manufacturer of a pioneer drug might have obtained from the three-year exclusivity that § 355(j)(4)(D)(iv) provides with respect to supplemental indications. Under the regulation, the FDA will not reject an ANDA merely because the agency has approved, within the preceding three years, a supplemental indication for the pioneer drug upon which the new generic is based. The agency will not approve the generic version for the supplemental indication, but may approve it for others.

To illustrate, in its proposed supplemental complaint BMS alleged that it holds the marketing rights for the pioneer drug Capoten®, generically known as "captopril." The FDA initially approved an NDA for the use of Capoten in treating hypertension. Based upon new clinical investigations, it has since approved two supplemental indications for use: one (in September 1993) for left ventricular dysfunction following myocardial infarction, and another (in January 1994) for diabetic nephropathy in patients with Type I insulin-dependent diabetes mellitus and retinopathy. Under the agency's interpretation of the Act, as manifested in the challenged regulations, the FDA could approve an ANDA for generic captopril for use in the treatment of hypertension five years after it approved the original NDA for Capoten; not until 1997, however, will the FDA approve the listing of diabetic nephropathy as an indication for use on the label of a generic version of Capoten.

BMS argues that § 355(j)(2)(A)(v) bars the FDA from approving any ANDA for generic captopril before 1997 if that application refers to research submitted to secure the approval of Capoten. Its argument is this: once the FDA has approved the listing of a supplemental indication on the label of a pioneer drug, the label of a generic version approved under § 355(j) less than three years later would necessarily include at least one fewer indication than the label approved for the pioneer drug. Section 355(j) prohibits that result, according to BMS, by requiring that the labels of the pioneer and of the generic version be "the same." Moreover, although the generic drug will not have been approved for the supplemental indication, physicians and pharmacists may—and in some cases state law or health insurance contracts require them to—use the generic product for the supplemental indication.

The FDA acknowledges that it "does not regulate ... the possible substitution of a generic drug for the pioneer by doctors or pharmacists." See Federal Trade Comm'n v. Simeon Mgmt. Corp., 391 F.Supp. 697, 706 (N.D.Cal.1975) (Act does not "interfere in or [ ] regulate the practice of medicine between the physician and the patient"); Legal Status of Approved Labeling for Prescription Drugs; Prescribing for Uses Unapproved by the Food and Drug Administration, 37 Fed. Reg. 16503 (1972) (Notice of Proposed Rulemaking) ("the new drug provisions apply only at the moment of shipment in interstate commerce and not to action taken subsequent[ly].... Once the new drug is in a local pharmacy ... the physician may, as part of the practice of medicine, lawfully ... vary the conditions of use from those approved in the package insert"). This explains why BMS considers it cold comfort that the FDA would withhold approval of a generic version of captopril for some indications but not others; once the FDA approves the sale of generic captopril for hypertension, the agency can offer BMS no assurance that physicians and pharmacists will not substitute it for Capoten in the treatment of diabetic nephropathy.

BMS first challenged the regulations by concurrently filing with the agency a citizen's

petition, 21 C.F.R. § 10.30, and a petition for stay of action, 21 C.F.R. § 10.35. In the former, BMS asked the agency to repeal the offending regulations. In the latter, BMS asked the FDA to stay the approval of any ANDA for the generic drug estradiol that makes reference to the appellant's listed drug Estrace® until the agency had responded to the citizen's petition. The FDA denied both petitions, after which BMS brought this action in the district court.

## II. Analysis

The district court dismissed the case on the ground that the allegations in the complaint failed to establish that BMS has standing to sue under Article III of the Constitution of the United States. The court then denied the appellant's motion to file an amended complaint because the new allegations failed to cure the constitutional deficiency. As the plaintiff's standing is a prerequisite to our jurisdiction, we turn to that issue before considering the appellant's request that we address the merits of its claim as a matter of law.

### A. Article III Standing

"[T]he irreducible constitutional minimum of standing contains three elements," *Lujan,* 504 U.S. at 560, 112 S.Ct. at 2136, commonly referred to as (1) injury-in-fact, (2) causation (or traceability), and (3) redressability. We examine the proposed amended complaint to see whether the allegations contained therein establish BMS's standing under *Lujan.*

### 1. Injury–in–Fact

To satisfy the first element of Article III standing

the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical'."

*Lujan,* 504 U.S. at 560, 112 S.Ct. at 2136 (citations omitted). In this case, we start with the more specific proposition that where, as here, a statutory provision reflects a legislative purpose to protect a competitive interest, the protected competitor has stand-ing to require compliance with that provision. *Hardin v. Kentucky Utilities Co.,* 390 U.S. 1, 6–7, 88 S.Ct. 651, 654–55, 19 L.Ed.2d 787 (1968).

At the pleading stage, a plaintiff can satisfy the injury-in-fact requirement by alleging facts that "demonstrate a realistic danger of [the plaintiff's] sustaining a direct injury." *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979); *see also Lujan,* 504 U.S. at 561, 112 S.Ct. at 2137 ("general factual allegations of injury resulting from the defendant's conduct may suffice" to establish standing, "for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim"). Moreover, under what we have termed the "competitor standing doctrine ... when a challenged agency action authorizes allegedly illegal transactions that will almost surely cause [a] petitioner to lose business, there is no need to wait for injury from specific transactions to claim standing." *El Paso Natural Gas Co. v. FERC,* 50 F.3d 23, 27 (D.C.Cir.1995); *see also Investment Co. Inst. v. FDIC,* 815 F.2d 1540, 1543 (D.C.Cir.1987).

In its initial complaint, BMS alleged it held the marketing rights to the pioneer drug Estrace, for which the FDA had approved a supplemental indication in September 1992. BMS explained as follows the nature of its injury:

17. ... Although a generic drug will be approved by FDA without the protected supplemental indication in its labeling, the omission fails to protect the innovator's rights [under § 355(j)(4)(D)(iv) ] because the generic drug will be dispensed for the protected indication as a result of two factors:

(a) First, every state has a law that either permits or requires a pharmacist to substitute a generic drug for the brand-name drug prescribed by a physician if the generic drug is considered therapeutically equivalent. In addition, health insurance contracts often require pharmacists to dispense a generic version to an insured pa-

tient if a therapeutically equivalent version is available.

(b) Second, in determining whether a generic drug is therapeutically equivalent for these purposes, states and pharmacies typically look to the FDA as authority. FDA considers a generic drug to be therapeutically equivalent to the innovator drug on which it is based even if the labeling of the generic drug does not include all of the indications approved for the innovator drug.

18. FDA publishes *Approved Drug Products with Therapeutic Evaluations*, commonly known as the "Orange Book," a publication listing each approved drug and stating whether it is considered therapeutically equivalent to other drugs containing the same active ingredient(s). When a generic version of a drug is approved, the Orange Book lists it as therapeutically equivalent to the innovator drug on which it is based. Thus, pharmacists throughout the country, when presented with a prescription for the innovator drug, may, or in some cases must, dispense a generic drug instead.

19. This substitution occurs even if the labeling of the generic drug does not include the indication for which the innovator drug is prescribed. Where FDA has approved one or more supplemental indications for the innovator drug entitled to exclusivity that are not also approved for the generic versions, the only difference in the Orange Book is that it contains a note, in an Appendix, setting forth the innovator's exclusivity right over the indication. Generic drugs are nevertheless listed as fully interchangeable with innovator drugs. Thus, when a physician prescribes an innovator drug for a recently approved and exclusive supplemental indication, the pharmacist often will be required to dispense a generic drug, even though the FDA has not approved the generic drug for that supplemental indication. This action renders any ... exclusivity rights covering the supplemental indication largely meaningless.

The district court concluded that these allegations describe an injury that is neither sufficiently imminent—because BMS had not alleged that any competitor was seeking approval to market a generic substitute for Estrace—nor fairly traceable to the challenged FDA regulations, and therefore fails both the first and the second requirements for standing explicated by the Supreme Court in *Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136. BMS sought leave to file an amended complaint alleging that in 1993 and 1994 the FDA approved supplemental indications for another innovator drug, Capoten, for which BMS held the marketing rights and that a competitor, Geneva Pharmaceuticals, had not only submitted an ANDA for a generic substitute, but had in fact obtained FDA approval.

The district court denied BMS leave to file the amended complaint. Without deciding whether the allegations regarding Capoten described an injury-in-fact, the court held that the amended complaint still failed to describe an injury traceable to the challenged FDA regulations—the issue to which we shall turn next. First, however, we take up the Secretary's argument that even the amended complaint fails adequately to allege an injury-in-fact.

■ The Secretary's argument rests entirely upon the premise that BMS suffered no injury from the FDA's approval of Geneva's generic product because BMS and Geneva have entered into an agreement, in settlement of a patent-infringement suit, that bars Geneva from marketing generic captopril during the period for which BMS claims statutory protection. The FDA, however, cites no authority for the proposition that a plaintiff loses its standing to challenge allegedly unlawful Government action by obtaining—presumably at some cost—a private remedy against the realistic danger of direct injury caused by that Government action; the assertion is too absurd to require refutation. Moreover, that proposition seems patently inequitable where the Government action, here the challenged regulations, creates a threat of recurring harms—indeed, the FDA concedes that it has tentatively approved seven other ANDAs for generic captopril—and the aggrieved party has shielded itself against only the most immediate threat.

## 2. Causation

The second element of constitutional standing is that

> there must be a causal connection between the injury and the conduct complained of— the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court."

*Lujan,* 504 U.S. at 560, 112 S.Ct. at 2136 (citations omitted). As noted earlier, the district court denied BMS leave to amend its complaint on the ground that any competitive injury to BMS is not fairly traceable to action by the FDA. Rather, "[t]he plaintiff's quarrel, if it exists, is with the pharmacists who dispense generics for protected indications or with the state statutes and health insurers who require this substitution. It is not with the defendants, whose regulation does no more than allow the marketing of generics properly labeled for unprotected indications."

This reasoning is inconsistent with the competitor standing doctrine. Consumers always decide whether to purchase the product of one competitor or another. The injury claimed here is not lost sales, per se; nor does BMS claim that the FDA has unlawfully authorized doctors and pharmacists to substitute generic captopril for Capoten. Rather the injury claimed is exposure to competition as a result of the FDA's authorizing Geneva Pharmaceuticals to market generic captopril. BMS claims that the Act makes such authorization unlawful, and does so for the purpose of protecting the manufacturer of a pioneer drug from the competition of generics. If BMS is correct, then it is no answer to say that the FDA is merely permitting a competitive product to enter the market and leaving the purchasing decision to the consumer. *See Telephone and Data Systems, Inc. v. FCC,* 19 F.3d 42, 47 (D.C.Cir.1994) ("injurious private conduct is fairly traceable to the administrative action contested in the suit if that action authorized the conduct or established its legality").

## 3. Redressability

Neither the district court nor the parties have expressed doubt about the adequacy of BMS's allegations to show it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan,* 504 U.S. at 561, 112 S.Ct. at 2136. Nor do we see any reason for doubt. A physician cannot prescribe and a pharmacist cannot sell what a manufacturer cannot market. If BMS were to prevail, then it would surely secure the broad relief from competition to which it says it is entitled under the statute.

## B. The Merits

Although the district court did not reach the merits of this case, BMS assures us that it has nothing to add to its complaint and so invites us, in the interest of judicial economy, to resolve the merits now rather than to remand the case to the district court. Ever anxious to conserve judicial resources, and hearing no objection from the Secretary, we accept the invitation.

The crux of the dispute is whether 21 U.S.C. § 355(j)(2)(A)(v) permits the agency to approve an ANDA for a new generic drug even though the label of the generic product will not include one or more indications that appear on the label of the pioneer drug upon which the ANDA is based. BMS rests its case squarely upon the first step in the analysis prescribed in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Thus, the question is whether the Congress has directly addressed the issue now in dispute. BMS argues that it has, and that the statute clearly precludes such approval, as follows: Section 355(j)(2)(A)(v) requires that the generic label be "the same" as that of the pioneer; there are two exceptions in the statute that, by negative implication, preclude all others; and neither exception permits the label of a generic product approved under § 355(j) to list fewer than all the indications listed on the label of the pioneer drug upon which the ANDA of the generic drug is based. Q.E.D.

Not so, says the Secretary. One of the statutory exceptions to the same-label requirement does "accommodate the situation in which the generic drug manufacturer has sought [§ 355(j) ] approval for fewer than all of the indications of the pioneer manufacturer's drug." That exception is for "changes required ... because the new drug and the listed drug are produced or distributed by different manufacturers." 21 U.S.C. § 355(j)(2)(A)(v). We agree.

First, only the Secretary's interpretation of § 355(j)(2)(A)(v) works in harmony with two other provisions of the Act. Section 355(j)(2)(A)(i) requires that an ANDA include "information to show that the conditions of use prescribed, recommended, or suggested in the labeling proposed for the new drug have been previously approved for a [listed] drug." This requirement would be redundant if the same label-requirement in § 355(j)(2)(A)(v) applied to indications for use. In addition, § 355(j)(3) lists the circumstances in which the Secretary may disapprove an ANDA; that the labeling proposed for the new generic does not list every indication approved for the pioneer is not among these. Instead, § 355(j)(3)(B) provides that the Secretary may disapprove an ANDA if "the information submitted with the application is insufficient to show that each of the proposed conditions of use have [sic] been previously approved for the listed drug referred to in the application." In other words, the statute expresses the legislature's concern that the new generic be safe and effective for each indication that will appear on its label; whether the label for the new generic lists every indication approved for use of the pioneer is a matter of indifference.

Second, and still more persuasive, § 355(j)(4)(D)(iv), by its terms, appears to protect the manufacturer of a pioneer drug only against the manufacture of a generic substitute using the pioneer's proprietary research undertaken to obtain approval for a supplemental indication. The appellant's interpretation of § 355(j)(2)(A)(v), however, would turn § 355(j)(4)(D)(iv) into a bar to the generic manufacturer's use of research undertaken to obtain approval for any indication for the pioneer drug, a reading that

offers much broader protection from competition than § 355(j)(4)(D)(iv) would otherwise confer. Under BMS's interpretation, every time a supplemental indication is added to the labeling of a pioneer drug, the manufacturer of the pioneer would get three more years of protection against the approval of any ANDA based upon that pioneer drug, including one that lists only the original indication(s) of the pioneer. By way of contrast, under the Secretary's interpretation of the Act, a pioneer drug manufacturer that obtains approval for a supplemental indication based upon proprietary research will enjoy three years during which the FDA will not approve any ANDA that includes the supplemental indication. BMS claims that economic reality renders the protection offered by the Secretary largely an illusion. Perhaps so, but why? By BMS's own account, it is because the value of the protection the Congress most clearly conferred upon pioneers would be greater but for some state laws and health insurers that mandate substitution of generic drugs. That is not a sufficient basis upon which to conclude that the Congress intended to confer upon the manufacturers of pioneer drugs the much broader protection that BMS now seeks.

Finally, we note that the Secretary's interpretation finds unusually strong support in the legislative history of § 355(j). The Report accompanying the House bill expressly noted that it "permits an ANDA to be approved for less than all of the indications for which the listed drug has been approved." H.R.Rep. No. 857 (Part I), 98th Cong., 2d Sess. 21–22, reprinted in 1984 U.S.C.C.A.N. 2654–55. BMS points out that the three-year period of exclusivity for supplemental indications in § 355(j)(4)(D)(iv) was added to the bill after the report was written, but that does not undermine the Secretary's argument. It suggests merely that the Congress added that provision understanding that § 355(j)(2)(v) does not prevent a generic manufacturer from obtaining approval for fewer indications than the FDA has approved for the pioneer—which is precisely the way in which the Secretary interprets the Act.

### III. Conclusion

The district court erred in denying the appellant's motion for leave to amend its complaint on the ground that the appellant had not established its standing to sue. On the merits, however, the appellant's claim comes up short as a matter of law. We therefore remand this case to the district court with instructions to dismiss the complaint pursuant to Rule 12(b)(6) and to enter judgment in favor of the Secretary.

*So ordered.*